# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **JACOB DUFFER,**<br>        Plaintiff<br><br>vs<br><br>**SUMNER COUNTY, TENNESSEE, GERALD HENRY, TONY MILLER, MICHAEL GRAVES, WILLIAM BRAD EIDSON, JAMES HART, SOUTHERN HEALTH PARTNERS, INC., SHARON HARRIS, CHERYL KELLEY, JASON CHRISTISON, PENNY PENNICK, CANDI BULLOCK, KENNETH MATHEWS, JR. M.D.**<br>        Defendants | Case No. 3:15-0860<br><br>Hon. Nixon/Brown<br><br><br><br><br>**JURY DEMAND** |

## SECOND AMENDED COMPLAINT

Plaintiff, pursuant to F.R.C.P. 15(a)(2) and with the written consent of all opposing parties, submits the following as his Second Amended Complaint. [1]

### JURISDICTION AND VENUE

1.    This action is brought by Plaintiff pursuant to 42 U.S.C. §1983 and the common and statutory laws of the State of Tennessee to redress the violation by Defendants of Plaintiff's rights secured by the Fourth, Fourteenth, and Eighth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §1331 to hear Plaintiff's claims arising under the Constitution and laws of the United States and under 28 U.S.C. §1343 to hear Plaintiff's claims to recover damages and to secure equitable relief under any Act of Congress providing for the protection of civil rights.

2.    This Court has supplemental jurisdiction over all state law claims alleged in this complaint under 28 U.S.C. §1367 as there is a common nucleus of operative facts

---

[1]        While all the defendants have agreed to allow the plaintiff to file this second amended complaint, all defendants have reserved and fully retain the right to challenge all facts and claims in this pleading.

1

between the state and federal law claims.

3. Venue is appropriate in the Middle District of Tennessee under 28 U.S.C. §1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred. Additionally, the defendants to this action are deemed to reside in this district under 28 U.S.C. §1391(c) and the individual defendants reside in this district; thus, venue is also appropriate under 28 U.S.C. §1391(b)(1).

## PARTIES

4. Plaintiff is currently a resident of Gallatin, Sumner County, Tennessee and was a resident of Sumner County during all relevant times in this complaint.

5. Defendant Sumner County is a political subdivision of the State of Tennessee and operates a county jail and workhouse under the supervision, direction, and control of the Sumner County Sheriff. Defendant Sumner County contracts with Defendant Southern Health Partners, Inc. ("SHP") to provide for the healthcare needs of individuals housed at the Sumner County jail.

6. Defendant Gerald Henry is a Corrections Officer employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this complaint, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

7. Defendant Sergeant Tony Miller, a white male, short black hair, skinny build, approximately late 20's in age, is a Corrections Officer employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

8. Defendant Michael Graves is an employee of the Sumner County Road Department who, at the time of the incidents giving rise to this claim, was a supervisor over the jail's work release inmates and thus was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

9. Defendant William Brad Eidson is a Corrections Officer employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this claim, was acting

2

under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

10. Defendant James Hart is a Corrections Officer employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

11. Defendant Southern Health Partners, Inc., is a corporation formed in Delaware with a principal office of 2030 Hamilton Place Blvd., Suite 140, Chattanooga, Tennessee, 37421-6039. Defendant's Registered Agent for service of process is CT Corporation System, 800 S. Gay St., Suite 2021, Knoxville TN 37929-9710. Defendant contracts with the Sumner County jail to provide medical services for individuals under the custody of the Sumner County Sheriff and thus performs an essential state function as a state actor.

12. Defendant Sharon Harris is an employee of Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

13. Defendant Cheryl Kelley is an employee of Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

14. Defendant Jason Christison is an employee of Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

15. Defendant Penny Pennick is an employee of Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

16. Defendant Candi Bullock is an employee of Defendant Southern Health Partners who, at

the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

17.    Defendant Kenneth Mathews, Jr. M.D., is an employee of or an independent contractor with Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

## GENERAL ALLEGATIONS

18.    On or about March or April 2014, while Plaintiff was a resident of Sumner County, Tennessee, he was arrested on a charge of Violation of Probation and incarcerated at the Sumner County jail without bail.

19.    On April 11, 2014, Plaintiff was seen by Defendant Sharon Harris. Although the jail form states that the April 11, 2014 visit was a "Doctor visit", Plaintiff was not seen by a doctor and Sharon Harris is only a Licensed Practical Nurse who is not trained, qualified, or licensed to medically diagnose or treat patients.

20.    Also on April 11, 2014, Plaintiff filed a grievance complaining of no hot water. The grievance was "sent to maintenance" and closed.

21.    On April 28, 2014, Plaintiff was found guilty of probation violation, his probation revoked, and his original sentence was put into effect with credit for time served. Plaintiff was taken to the Sumner County jail to finish serving out his sentence with an anticipated parole eligibility date around March, 2015.

22.    On April 28, 2014, Plaintiff used the grievance system to request that he be put on trustee status and assigned to a work crew to earn two-for-one jail credit. His name was forwarded to Capt. Canter.

23.    On May 10, 2014, Plaintiff filed a grievance saying he needed immediate medical attention. He stated that he had filled out two sick calls already. His chief complaint was "scaibies" [sic] and he indicated that about half a dozen other inmates suffered from the same ailment. (Scabies is an itchy, highly contagious skin disease caused by an infestation

4

by the itch mite *Sarcoptes scabiei*.) Plaintiff had complained to medical several times and each time was told to fill out a sick call slip. After a week and a half, he was told by medical staff that they were out of the necessary cream. Plaintiff was unable to sleep for days and itched until he bled. The grievance was merely delivered to medical staff by jail staff and the grievance was then considered "closed".

24. On May 12, 2014, Plaintiff filed another grievance about the lack of medical attention for his scabies. Again, jail guards told him no creme was available. Plaintiff wrote "PLEASE PLEASE PLEASE HELP THIS IS TORTURE. PLEASE SEND TO SONYA TROUT PLLLEEEAAASSSEEE IM [sic] IN PAIN". Jail staff responded that creme had been ordered but had not yet arrived but stated that medical would get Plaintiff the creme "tomorrow when it comes in."

25. On May 13, 2014, Plaintiff filed another grievance again begging for the creme, saying he was in "pain and great irritation".

26. On May 23, 2014, Plaintiff was seen by a nurse for a wound on his back that was not healing, believed to be caused by a spider bite. The nurse, who was not trained, qualified, or licensed to medically diagnosis and treat patients, nonetheless treated the wound and provided antibiotics. Dr. Mathews, the jail physician, did not review the treatment until August 29, 2014 and never personally examined the plaintiff for this ailment.

27. At one point, Plaintiff's girlfriend called the jail to complain about the lack of treatment. After the call, Plaintiff was pulled aside by Defendant Jason Christison and asked if Plaintiff thought he was special. Christison, who is not trained, qualified or licensed to medically treat patients, threatened to file harassment charges if his girlfriend called one more time. Christison said that he had 800 patients in the building and that Plaintiff was not more special than the rest.

28. Plaintiff first started feeling his side hurt towards the end of the first week of August, 2014. By the second week in August, 2014, he started spitting up blood and his symptoms became worse after that. Plaintiff went from spitting up chunks of blood to a half cup of blood to a full cup within a week's period of time.

29. On one occasion, Plaintiff showed a bloody napkin to Defendant Officer Hart to show

5

him he really needed help. Officer Hart did nothing but said, "if it was up to me I'd get you back there [to medical] right now but I can't make the nurses do anything. Fill out a sick call. It's out of my hands." Defendant Hart did not bother to call 911 or arrange for Plaintiff to be taken to the hospital.

30. On or about the second week of August, 2014, Plaintiff was walking down the road during his work crew duties and his vision starting going crazy and he started to black out so he sat down in a ditch to gain his composure. After fighting for breath for a few minutes he started to get better so he stood up and got on the work bus and sat down. After a minute, he started to feel funny again so he leaned over and then became nauseated and started vomiting, the worse vomiting he had ever experienced. Defendant Graves witnessed this but did nothing.

31. There were two times he was brought back from work to the jail because of sickness. Once during the incident in the paragraph above and once the following Monday. Neither time was he taken to a hospital or provided with medical care although both times were witnessed by Defendant Graves.

32. Eventually, Plaintiff could not eat and his lack of food lasted about two weeks before he was finally sent to hospital.

33. On August 20, 2014, Plaintiff filled out a sick call request noting that he believed his blood sugar was dropping and that he was getting dizzy, tired, grouchy and sweating almost every day. His blood sugar was 53 the day before. He reported having this problem for the previous two weeks.

34. Plaintiff was not seen by Penny Pennick, a/k/a "Nurse Penny", a Licensed Practical Nurse, who is not trained, qualified, nor licensed to medically diagnose or treat patients, until August 22, 2014 and Dr. Mathews did not order daily blood sugar tests until September 3, 2014. Dr. Mathews issued this order without ever examining the plaintiff himself.

35. On August 26, 2014, Plaintiff was examined for tuberculosis by Cheryl Kelley, a Licensed Practical Nurse who is not trained, qualified or licensed to medically diagnose or treat patients. The plaintiff was noted as fatigued and disheveled and, despite his

6

history of vomiting, bloody discharge and nausea, Cheryl Kelley did nothing.

36. By the last week before he was hospitalized, Plaintiff was vomiting bile and blood. His skin had turned yellow from jaundice and he had become anemic and blood vessels were appearing in his eyes. Plaintiff's kidneys had begun to fail.

37. On August 27, 2014, Plaintiff filled out a sick call request noting that he was suffering from the "worst pain I've ever been in in my life!" Plaintiff complained that all his glands were swollen and that he was "spitting up lots of blood." He noted that "if it gets any worse I'll need to be hospitalized. PLEASE HELP ME!!"

38. On August 28, 2014, Defendant Penny Pennick, a Licensed Practical Nurse who is not trained, qualified, or licensed to medically diagnosis and treat patients, noted "3 days congested spitting up bloody content. Pressure in head and ears." Regardless, Pennick did nothing. Despite this evidence of serious medical need, Dr. Mathews failed to personally exam the plaintiff.

39. On one occasion, likely sometime in the first week or two of September, Plaintiff approached Defendant Eidson in the trustee housing unit and said he needed to speak in private. Outside the housing unit, Plaintiff told him that he was sick but didn't know what to do and that he could not get the help that he needed. Eidson told him that his arm was twisted behind his back and there was nothing he could do because he had no control over the nurses and he could not make them do anything. Eidson had been aware of Plaintiff's illness because other inmates had directed him before to Plaintiff on his bed and told him that Plaintiff was "really, really sick". Others had also told Eidson that Plaintiff was coughing up blood. Instead of getting the plaintiff the needed medical help, Eidson just walked away. On September 11, 2014, Plaintiff filled out a sick call request noting that he had "bad vomiting, bad diarrhea" and gets "exhausted very easy". He closed by saying he is in "bad shape".

40. Defendant Candi Bullock, a Licensed Practical Nurse who is not trained, qualified, or licensed to medically diagnosis and treat patients, on an unknown date, instructed the plaintiff to drink plenty of liquids and to eat small amounts and prescribed Simethicone (for gas) and Pepsid (for heartburn). Dr. Mathews signed off on this course of treatment

7

without ever examining the plaintiff himself.

41.     On one occasion, probably around the first week in September, 2014, Plaintiff begged Corrections Officer Gerald Henry for help. Henry had two other inmates carry the plaintiff to the medical ward. Plaintiff told the nurse that he needed to be taken to the hospital, that something was "seriously wrong". The nurse merely asked him if he had filled out a sick call form. When Plaintiff responded that he had not, she instructed him to turn around and fill out a sick call form. The nurse refused to see him without a form despite his obvious need for medical care.

42.     The same nurse then accused the plaintiff of faking his symptoms. The nurse rolled her eyes and said that the plaintiff did not look that sick to her and that she did not have time to see him right then. Other inmates on sick call would try to get the nurse to see the plaintiff first but the nurse would say "I'll get to him whenever I can."

43.     Plaintiff left the medical office and collapsed in the hallway and refused to leave. Plaintiff asked Officer Henry to get the sergeant because he needed help. When the Sergeant arrived, he said there was nothing he could do because the nurses do not work for the jail. The sergeant then made the plaintiff return to his pod. When Plaintiff returned to his jail cell he collapsed.

44.     On another occasion, the plaintiff gave a sick call form to a corrections officer and the guard told him that nurses did not have time to see him and handed him the form back, saying, "it's no use".

45.     On September 17, 2014, Plaintiff filled out a sick call request noting that he was "losing weight fast, still can't hold down food without vomiting." Plaintiff mistakenly believed he was suffering from an ulcer as he noted it was "making me spit lots of blood." He also stated he could not walk but short distances. He noted that he had been suffering these symptoms for one month.

46.     Despite complaints of spitting up blood, Nurse Candi Bullock, a Licensed Practical Nurse who is not trained, qualified, or licensed to medically diagnosis and treat patients, did not see Plaintiff until a week later and put Plaintiff on Ibuprofen and took him off work detail. Dr. Mathews signed off on this course of treatment without ever examining the

8

plaintiff himself. Ibuprofen is contraindicated for patients with leukemia or those who are undergoing or expected to undergo chemotherapy.

47. Michael Graves, who was in charge of the inmate work detail and who worked for Sumner County Road Department, demanded that the plaintiff be seen by a doctor. While commendable, Mr. Graves never himself called 911 or even considered taking the plaintiff to the hospital himself while the plaintiff was under his care on the work crew.

48. By the time Plaintiff was taken to the hospital, he had bruises all over his body from his blood count plummeting.

49. Finally, on September 24, 2014, Plaintiff had his blood drawn and sent to the lab. The lab returned a report showing anemia, severe leukocytosis, and severe thrombocytopenia and recommended ruling out acute leukemia. Plaintiff's white cell count was over 2000% higher than normal and his red cell count was half the normal low range. His platelet count was only 22% of low normal.

50. Between August 26, 2014 and September 24, 2014, Plaintiff was seen by various nurses, all Licensed Practical Nurses who have very limited medical training, who would then sometimes relay information to Dr. Mathews who would never actually see the inmate patients himself.

51. Plaintiff was first seen by the jail physician, Dr. Mathews, on September 24, 2015.

52. On September 25, 2014, around 6:30 pm, Plaintiff was finally taken to the Sumner County Medical Center Emergency Department due to abnormal lab results from blood sent to the lab on September 24 and due to blood noted in sputum by Nurse Sharon Harris (a condition she had been aware of at that time for well over a month).

53. By 7:40 pm on September 25, 2014, doctors decided to transfer the plaintiff to Centennial Medical Center Intensive Care Unit because of the severity of his condition. He was given a tentative diagnosis of blast crisis (which is Stage III of Acute Myeloid Leukemia) and acute renal failure. The ER doctor noted the plaintiff as being "frail, pale" and ordered his transfer to Centennial in "Critical Condition".

54. In blast crisis, there are 20% or more blasts in the blood or bone marrow or the leukemia blasts have spread outside of the bone marrow, and it is difficult to control the number of

9

white blood cells. Patients in blast crisis often have a fever, an enlarged spleen, weight loss, and generally feel unwell.

55. Acute Myeloid Leukemia is typically diagnosed through a routine blood analysis or Complete Blood Count (CBC). Patients with Acute Myeloid Leukemia will exhibit high levels of white blood cells and, in advanced stages, low levels of red blood cells (anemia) and either elevated or decreased numbers of platelets.

56. On or about September 28, 2014, Plaintiff received his first round of chemotherapy.

57. On or about September 28, 2014, Heather Scott, a.k.a. Heather Driver, a Sumner County Sheriff's deputy, emailed the Sumner County jail administrator Sonya Troutt, along with several jail supervisors and a generic email address of "Medical Provider" regarding precautions to observe around the plaintiff because of his decreased immunities secondary to his chemotherapy treatments. The email lists several precautionary measures, such as flushing the toilet twice, always washing hands, etc. This list was plagiarized from a verbatim list on www.cancer.org. Heather Scott has no particular training on how to ensure chemotherapy patients are not exposed to infection.

58. Also on September 28, 2014, Deputy Heather Scott/Driver emailed to say that Plaintiff's chemotherapy was expected to last another four to six weeks at the least and then would go down to every other week for a week's duration each time to get treatment.

59. Because of the expected cost of this treatment, Sumner County and Southern Health Partners contacted the District Attorney's office and asked that the plaintiff be released from jail. This is a form of patient dumping with a sole purpose of helping a medical provider save money. As a result of his release from incarceration, Plaintiff was dumped by Sumner County and Southern Health Partners and left with no insurance or means to pay for his medical care.

60. On or about October 1, 2014, Sumner County Criminal Court Judge Dee David Gay, at the request of Sumner County and through Assistant District Attorney Joe James, suspended the remainder of Plaintiff's sentence and ordered his release to unsupervised probation for the remainder of his sentence on the grounds that Plaintiff was suffering "serious health problems such that the Defendant and the State will be better served by an

10

alternative to incarceration." At the time this order was entered, Plaintiff had been in the Sumner Regional Medical Center or Centennial Medical Center undergoing treatment for several weeks. While the judge's order does not specifically state this, the real reason for having his sentence suspended was so that Sumner County would not have to pay for Plaintiff's medical treatment which was expected to be of long duration and very expensive. Releasing the plaintiff without health insurance would not "better serve" the defendant as the judge had stated. This medical release or dumping was in direct violation of the agreement between Sumner Regional Medical Center and Sumner County which provided that "County shall not be relieved of its responsibility if the patient-Inmate receives a furlough during the Inmate's treatment at SRMC if the furlough is requested by the County.... County shall be responsible for payment of all invoices for the care provided to State Prisoners."

61. Sumner County and Southern Health Partners have a financial arrangement which creates financial incentive to deny medical care to inmates and they have a history of denying medical care to inmates going back as far as 1983. For example, those inmates, like the plaintiff, who are state prisoners are not given the usual 80% discount on medical costs by Sumner Regional Medical Center like inmates who are pretrial detainees. Thus, Plaintiff's medical treatment at SRMC would have cost substantially more than normal and this was an incentive for the county to medically dump the plaintiff.

62. Plaintiff was released from Centennial Medical Center in Nashville around the end of September and moved to Louisiana two to three weeks later to be cared for by his mother. He has since returned to live in Sumner County, Tennessee.

## COUNT I

### (1983 - Sumner County)

63. Sumner County developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons incarcerated in the Sumner County jail and of persons coming in contact with its deputy sheriffs, jailers, and other employees, all of which caused the violation of the Plaintiff's rights.

64. It was the policy and custom to inadequately and improperly investigate incidents of

11

misconduct by subordinate members of the Sumner County Sheriff's Department and other departments, and acts of misconduct were instead tolerated by Sumner County, including but not limited to previous incidents of refusal of medical treatment committed by Sumner County personnel. In fact, practices by Sumner County employees/contractors of denying medical treatment to inmates goes as far back as 1983.

65. It was the policy and custom of Sumner County to inadequately supervise and train its employees and contractors, including the individually named defendants/employees of Sumner County and Southern Health Partners, thereby failing to adequately discourage further constitutional violations on the part of its officers/employees. The following are illustrative of the failure to supervise and train and of the deliberate indifference to the rights of inmates:

   a. Failure to require entry of medical reports in prison records when medical attention was required for an inmate;

   b. Failure to have competent designated medical authority;

   c. Failure to arrange for physical examinations to be given by someone under a physician's supervision;

   d. Failure to provide emergency or medical training for jail personnel and other employees and contractors who come into contact with inmates;

   e. Failure to arrange for timely and regular medical personnel who are trained, qualified and licensed, to address inmate medical needs;

   f. Entering into a contract for medical care that provided a disincentive for the physician to physically exam inmates.

   g. Failure to properly and forcefully discipline other acts of misconduct by employees and contractors;

   h. Failure to train jail personnel and other employers and contractors regarding jail policy with regard to medical needs of inmates. For example, Sumner County jail policy specifically states that if an inmate requests medical care, if a supervisor feels the request is an emergency and cannot wait for a medical professional, the inmate "shall" be taken to Sumner Regional Medical Center. This mandatory

12

policy was not followed in the plaintiff's case.

    i.    Failure to enforce the jail policy that an inmate that requires immediate medical attention "inform a corrections officer immediately." Contrary to this policy, when the plaintiff would inform a corrections officer, nothing was done by that corrections officer other than direct the plaintiff to fill out a sick call form.

    j.    Failure in maintaining a policy that allowed a licensed practical nurse, with very little medical training and not licensed to diagnose or treat medical issues, to decide in his or her desecration, whether an inmate should even see a doctor.

    k.    Failure to enforce jail policy requiring the medical records clerk to "check daily with the doctor to set up appointments with the doctor."

    l.    Failure to account for inmates who are bedridden and unable to come to their cell door to receive medication.

    m.    Failure to train its employees to handle recurring situations presenting an obvious potential for constitutional violation.

66.    The failure to provide inmates with needed medical care was not reasonably related to any legitimately related governmental or penalogical objective but inside it is related to the need to save money.

67.    It was the policy, custom and practice to inadequately and improperly provide for the medical needs of inmates at the Sumner County jail.

68.    It was and is the policy, practice and custom of Sumner County to inadequately and improperly investigate denial of medical care of inmates, and acts of misconduct were instead tolerated by Defendant, including, but not limited to, the following incidents:

    a.    Delay of necessary medical treatment;

    b.    Medical evaluation and diagnosis by inadequately trained corrections officers or nurse aides or practical nurses not licensed to diagnose or treat illness or injury;

    c.    Failure to properly train corrections officers and other employees in recognizing emergency and urgent care situations;

69.    Defendant Sumner County knew or should have known of such acts of misconduct by its jail personnel and Sheriff and that the medical care available was inadequate.

13

70.	As a result of the above described policies, practices and customs, the individually named defendants believed their actions would not subject them to possible punishment by their employer, Sumner County, and that misconduct would not be investigated or sanctioned, but would instead be tolerated.

71.	The above described policies, practices and customs demonstrated a deliberate indifference on the part of Sumner County to the constitutional rights of incarcerated persons, specifically their rights under the 4th, 8th and 14th Amendments to the U.S. Constitution against unreasonable seizure and cruel and unusual punishment, and were the cause of the violations of the Plaintiff's rights alleged in this complaint.

72.	The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against the individually named defendants and for previous and on-going incidents involving failure to provide seriously needed medical attention, show a likelihood of recurrence that is objectively unreasonable.

73.	As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

## COUNT II

### (T.C.A. 8-8-302 - Sumner County)

74.	Defendants Gerald Henry, Tony Miller, William Brad Eidson, James Hart were appointed by the Sheriff at the time of their actions and were within the scope of their employment and were acting by virtue of or under color of the office. Therefore, Defendant Sumner County is liable for the actions of the individually named defendants as described above and below and under each count pursuant to T.C.A. 8-8-302.

## COUNT III

### (1983 -
### Gerald Henry, Tony Miller, Michael Graves, William Brad Eidson, James Hart, Sharon Harris, Cheryl Kelley, Jason Christison, Penny Pennick, Candi Bullock, Kenneth Mathews)

75.	Defendants Gerald Henry, Tony Miller, Michael Graves, William Brad Eidson, James Hart, Sharon Harris, Cheryl Kelley, Jason Christison, Penny Pennick, Candi Bullock,

14

Kenneth Mathews, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th, 14th, and 8th Amendments to the U.S. Constitution by deliberately, intentionally, and/or unreasonably failing to provide first aid or other medical attention to the Plaintiff's serious injuries;

76. Defendants refused to provide assistance to the plaintiff for a serious condition that was obvious with callous indifference, malicious motivation to punish, or unreasonably.

77. As a direct and proximate result of the said acts of Defendants, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

78. The actions of Defendants violated clearly established and well settled federal constitutional rights of pretrial detainees and prisoners as guaranteed by the 4th, 8th and 14th Amendments to the U.S. Constitution.

**COUNT IV**

**(1983 - Southern Health Partners)**

79. Defendant Southern Health Partners, Inc. developed and maintained policies, practices or customs exhibiting deliberate indifference to the constitutional rights of persons detained or incarcerated in Sumner County, Tennessee and of persons coming in contact with its medical staff, all of which caused the violation of the Plaintiff's rights.

80. It was the policy, practice and custom to inadequately and improperly investigate incidents of misconduct by subordinate members of the staff and acts of misconduct were instead tolerated.

81. It was the policy, practice and custom of Southern Health Partners to inadequately supervise and train its medical staff, including the individually named defendants/employees, thereby failing to adequately discourage further constitutional violations on the part of its staff. The following are illustrative of the failure to supervise and train and of the deliberate indifference to the rights of inmates:

    a.    Failure to provide medical training for its staff so as to recognize the need for medical treatment of serious medical conditions;

    b.    Failure to prohibit a person who is not a licensed physician from diagnosing and treating serious illness or injury;

15

c.     Failure to properly supervise medical staff by a qualified physician;

d.     Failure to arrange for regular doctor's on-site visits by a licensed physician.

e.     Failure to enforce the SHP-County agreement where nurses were to "train officers in the Jail on various medical matters."

f.     Failure to assign a "medical director" and require him or her to regularly "arrange for medical services for any inmate who, in the opinion of the Medical Director (hereinafter meaning a licensed SHP physician), requires such care. Instead, SHP allowed licensed practical nurses, who are not licensed, trained or qualified to render an opinion as to whether an inmate needs medical services, to make this decision in their own discretion and without even consultation with a physician.

g.     Failure to exercise administrative supervision over Dr. Mathews as necessary to ensure the strict fulfillment of the obligations contained in the agreement between SHP and the county.

h.     Failure to ensure that all SHP employees and/or independent contractors comply with all federal, state and local laws, rules and regulations as well as jail policies and procedures relating to inmates.

i.     Failure to create a training and supervision program such that it was adequate for the tasks the jail nurses were required to perform. Such inadequacy resulted from SHP's deliberate indifference and such inadequacy actually caused or was closely related to Plaintiff's suffering. Such failure goes as far back as 1983 and SHP's continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees establishes a conscious disregard for the consequences of its action.

j.     Failure to train its employees to handle recurring situations presenting an obvious potential for constitutional violation.

82.   The failure to provide detainees with needed medical care was not reasonably related to any legitimate governmental or penalogical objective.

83.   It was the policy, custom and practice to inadequately and improperly provide for the medical needs of inmates under the custody of the Sumner County jail.

16

84. It was and is the policy, practice and custom of Southern Health Partners to inadequately and improperly investigate incidents of denial of medical care of detainees and acts of misconduct were instead tolerated by Defendant, including, but not limited to, the following:

    a.    Denial of needed medical care despite the knowledge that the plaintiff was spitting up blood and exhibiting other symptoms of serious illness;

    b.    Failure to properly train staff in recognizing emergency and urgent care situations;

    c.    Failure to discipline the nurses who refused medical treatment to the plaintiff or improperly diagnosed him;

    d.    Failure to train and discipline the nurses who had a history of refusing medical care to inmates.

    e.    Failure to ensure jail nurses provided medical treatment to inmates in need of such regardless of whether a sick call form had been filled out or not.

    f.    Failure to ensure that licensed practical nurses did not exceed the legal scope of their licensure and that they did not diagnose or treat medical illness or decide on their own whether an inmate was sick or sick enough to see a physician.

    g.    Failure to ensure that licensed practical nurses were directly supervised by a registered nurse or physician.

    h.    Failure to maintain a quality improvement program to monitor compliance with SHP and county policies and procedures.

85. Defendant knew or should have known of such acts of misconduct by its personnel.

86. As a result of the above described policies, practices and customs, the individually named defendants believed their actions would not subject them to possible punishment by their employer, Southern Health Partners, and that misconduct would not be investigated or sanctioned, but would instead be tolerated.

87. The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of Southern Health Partners to the constitutional rights of persons under the care, custody and control of the Sumner County jail, specifically their rights under the 4th, 8th and 14th Amendments to the U.S. Constitution

17

against deliberate indifference to serious medical needs, and were the cause of the violations of the Plaintiff's rights alleged in this complaint.

88. The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against the individually named defendants, show a likelihood of recurrence that is objectively unreasonable.

89. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

## COUNT V

### (Negligence - Sumner County)

90. Tennessee state law mandates that it is the duty of a county to provide medical attendance upon all prisoners confined in the jail in their respective counties. Thus, Sumner County had a duty to provide adequate medical care to the plaintiff under state law.

91. Sumner County sought to effectively furlough the plaintiff with permission of the criminal court judge in an attempt to avoid payment of the medical costs.

92. Even after the plaintiff was released from custody by the judge's order, he remained an inmate for the purpose of medical treatment as an inmate on furlough is still an inmate.

93. Sumner County was negligent in failing to adequately contract for medical care of those in its custody and in failing to ensure that its employees, independent contractors, nurses, and others responsible for medical care of inmates implemented and enforced policies and procedures that provided for medical care of inmates and in failing to train its employees and others accordingly.

94. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

## COUNT VI

### (Negligence -
### Gerald Henry, Tony Miller, Michael Graves, William Brad Eidson, James Hart, Sharon Harris, Cheryl Kelley, Jason Christison, Penny Pennick, Candi Bullock, Kenneth Mathews)

95. Defendants Gerald Henry, Tony Miller, Michael Graves, William Brad Eidson, James Hart, Sharon Harris, Cheryl Kelley, Jason Christison, Penny Pennick, Candi Bullock,

18

Kenneth Mathews, negligently failed to provide the plaintiff with adequate medical care in accordance with state law.

96. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

## COUNT VII

## (Negligence - Southern Health Partners)

97. Tennessee state law mandates that it is the duty of a county to provide medical attendance upon all prisoners confined in the jail in their respective counties. Thus, Sumner County had a duty to provide adequate medical care to the plaintiff under state law.

98. Defendant Southern Health Partners willingly accepted the county's duty to provide medical care of inmates.

99. Sumner County sought to effectively furlough the plaintiff with permission of the criminal court judge in an attempt to avoid payment of the medical costs.

100. Even after the plaintiff was released from custody by the judge's order, he remained an inmate for the purpose of medical treatment as an inmate on furlough is still an inmate.

101. Southern Health Partners was negligent in failing to adequately contract for medical care of those in its custody and in failing to ensure that its employees, independent contractors, nurses, and others responsible for medical care of inmates implemented and enforced policies and procedures that provided for medical care of inmates and in failing to train its employees and others accordingly.

102. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

## PRAYER FOR RELIEF

Plaintiff requests that the Court award the following:

1. Judgment against Defendant Sumner County for compensatory damages in an amount to be determined at trial;

2. Judgment against the individual defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at trial;

3. Judgment against Defendant Sumner County for compensatory and punitive damages by

19

virtue of their state statutory vicarious liability for the actions of its deputies;

4.  Injunctive relief in the form of an order compelling Defendants to comply with Tennessee Corrections Institute and American Correctional Association standards regarding medical treatment of inmates, and to properly train personnel and revamp its policies with regard to medical care for inmates, included the providing of regular and timely physician care (not LPN care);

5.  Judgment against Southern Health Partners  for compensatory and punitive damages in an amount to be determined at trial;

6.  Trial by jury on all issues;

7.  Reasonable attorney's fees pursuant to 42 U.S.C. 1988;

8.  Cost of suit and such other and further relief as the court deems just and proper.

Respectfully submitted,

 /s/ Jerry Gonzalez
Jerry Gonzalez (18379)
Attorney for Plaintiff
2441-Q Old Fort Parkway
No. 381
Murfreesboro TN 37128
615-360-6060
jgonzalez@jglaw.net

20

## CERTIFICATE OF SERVICE

   I certify that I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following:

| | |
|---|---|
| Tom Russell | Daniel F. Beasley |
| Sarah L. Blood | Lanier Ford |
| Gullett Sanford Robinson & Martin PLLC | 2101 West Clinton Ave., Suite 102 |
| 150 Third Avenue South | Huntsville, AL 35805 |
| Suite 1700 | 256-535-1100 |
| Nashville, TN 37201 | DFB@LanierFord.com |
| 615.921.4262 | |
| trussell@gsrm.com | Attorney for SHP defendants |

Erika Porter
Leah May Drennan
Sumner County Attorney
Sumner County Admin Bldg
355 North Belvedere Drive, Room 303
Gallatin, TN 37066
615-451-6060

Attorneys for Sumner County defendants

   This 23rd day of November, 2015.

         /s/ Jerry Gonzalez